UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-160(18) (NEB)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

MALCOLM SAMUELS
a/k/a "Reggie,"

        Defendant.

**GOVERNMENT'S SENTENCING POSITION**

*"Whether it be from violence with guns, drug sales, a combination of both, we have been preyed upon enough as a community."*

- Concerned Community Member Who Fears Retaliation.

For over 20 years, the Highs criminal enterprise attempted to hijack much of north Minneapolis. It indoctrinated youth, funded its operation by converting public spaces into open-air drug markets, and desensitized entire neighborhoods to the regular sound of machinegun fire. Highs members glorified the gang at the expense of any other consideration. It was more important to shoot a rival gang member on sight—be it a public place, a drive-by shooting, or at a well-attended party—than to worry about killing innocent bystanders. The Highs criminal enterprise is a scourge on public safety.

Defendant Malcolm Samuels must answer for the role he played in the Highs' narcotics trafficking empire and its associated gun violence.[1] The whole here is much greater than the sum of its parts, and Samuels' decision to sell the enterprise's drugs and benefit from its reservoir of firearms contributed to the pervasive sense of fear,

---

[1] For each defendant in this matter, the government will simultaneously file a sealed letter to the Court outlining additional information regarding each defendant's broader role in the Highs criminal enterprise.

instability, and danger that has held north Minneapolis hostage for two decades. For his contribution to, and acceptance of, these realities, Samuels' sentence must reflect the seriousness of the offense, promote respect for the law, and effectuate necessary deterrence. The government respectfully submits that a sentence within the Guidelines range is sufficient but not greater than necessary to achieve the goals of sentencing.

### The Highs Criminal Enterprise

The Highs began laying claim to areas of north Minneapolis in 2004. Since that time, the Highs have dominated a large swath of north Minneapolis and its members have ruthlessly protected its turf. The Highs are engaged in a violent rivalry with the Lows. Each gang's moniker stems from its location—north or south—of West Broadway Avenue in Minneapolis:



*Figure 1: Overview of Highs and Lows Territories*

The May 2004 murder of Christopher Little, a known Lows member, proved to be a cataclysmic event in the history of the enterprise. Members of the Highs and Lows

have engaged in hundreds of shootings and murders in their territories since Little's murder, which only serves to restart the circles of violence and revenge. The victims of the violence were not only members or associates of the gangs, but also innocent adults and children who simply live within the gangs' territories.

Although the Highs enterprise consists of several "cliques," the gang's singular objective has remained the same: its members must "put in work" to promote, benefit, and enrich the gang. Highs members must commit acts of violence, procure firearms to facilitate the gang's activities, or engage in criminal activity such as fraud, robbery, or drug trafficking. The only other requirement is that members instill fear in rival gang members. Members of the Highs are expected to "hunt" rival gang members: an express directive to locate and kill rivals. Highs members also are expected to defend each other and to respond to any perceived disrespect from rival gangs. Highs and Lows gang members frequently take to social media to heighten their rivalry. Members of each gang post photographs trespassing in the other gang's territory or defacing the graves of murdered rivals. Highs members also frequently post images of themselves with money, drugs, and expensive items to gain respect. This glorification of gang life also serves to lure others into the lifestyle.

The Highs' existence depends on the success of the criminality of its members, which is comprised of a loosely defined and fluid hierarchy of (1) members who earned substantial respect from past criminality and receive a higher amount of the profits, host gatherings, and cover funeral expenses; (2) members focused on engaging in armed violent activity to protect Highs activities and target rival members; and (3) members focused on drug or weapons trafficking to further the ends of the criminal enterprise.

3

Its members resort to any crime—murder, kidnapping, arson, robbery, bribery, extortion, gambling, fraud, drug trafficking, arms dealing—so long as it glorifies the Highs enterprise or denigrates a rival gang.

Although its general credo has created violence in many parts of Minneapolis, a particular area within Highs territory acts as a representative microcosm of its activities. The Highs criminal enterprise runs rampant in the area of West Broadway and North Lyndale Avenue, including numerous businesses, and turned it into a de facto Highs headquarters:



*Figure 2: Intersection of West Broadway and North Lyndale Avenue in Minneapolis*

In fact, the Winner Gas Station has been openly referred to as "The Murder Station," "Murder Shop," or simply the "Murder," while the nearby Merwin Liquors and

Walgreens have been essentially open-air drug markets.[2] The Highs stranglehold on this area has been so tight that its members do not hesitate to flaunt their illegal activities openly:



*Figure 3: Highs Member Flaunting Currency Outside Winner Gas in Highs Territory*

The sheer amount of gun violence, drug trafficking, and other illicit activity demonstrate the extent to which the Highs have damaged the community. Between 2018 and 2023, in north Minneapolis alone—comprising both Highs and Lows territory—the statistics are staggering:

- 2,043 recovered firearms;
- 105 recovered switches;
- 7,997 "shots fired" calls;

---

[2] This Walgreens location has since closed, in part due to the Highs activities in and around its location. This is a representative example of how the enterprise can affect the economic health of communities.

5

- 20,265 ShotSpotter activations;
- 1,151 gunshot victims; and
- 155 homicides

The plague of opioids—and particularly fentanyl, a prime Highs product—requires no introduction. According to the Minnesota Department of Health, in 2022, Minnesota reported 4,228 non-fatal opioid-involved overdoses.[3] Unfortunately, overdose deaths in Minnesota due to opioid misuse has skyrocketed from 342 in 2018 to 1,002 in 2022.[4] Hennepin County alone experienced 378 opioid-related deaths in 2022, 94.7% of which were directly linked to fentanyl.[5] Beginning in approximately 2020, the Highs began actively contributing to this epidemic when it transitioned from marijuana sales as its primary moneymaker to instead peddling synthetic opioids.

Put simply, instead of getting gas at the local station or picking up prescriptions at the neighborhood Walgreens, residents near Highs territory live with the fear of being robbed, shot with a machinegun during a gang-related shooting, or losing a loved one to a fentanyl-related incident. The Highs criminal enterprise, fueled by the greed of its members and their thirst for power and respect, is a public health crisis.

## Malcolm Samuels' Criminal Conduct

Defendant Malcolm Samuels is a member of the Freeshotz and Young n' Thuggin (YNT) subsects of the Highs criminal enterprise. ECF No. 1206 (PSR) at ¶ 16. His "work" for the gang focused on drug trafficking, the enterprise's proverbial bread and butter, and epitomized the Highs' transition from trafficking marijuana to distributing

---

[3] Minnesota Department of Health, *Drug Overdose Dashboard,* last accessed 2/6/2024 at https://www.health.state.mn.us/opioiddashboard.
[4] *Id.*
[5] Hennepin County, *Overdose Epidemic*, last accessed 2/6/2024 at https://www.hennepin.us/opioid.

6

fentanyl.  *See, generally, id.* at ¶¶ 17-25.  A snapshot of Samuels' acts shows his association with the Highs criminal enterprise and his proximity to its narcotics trafficking and firearms possession.  For example, in July of 2019 Samuels was arrested in possession of marijuana.  *Id.* at ¶¶ 17-18; ECF No. 647 (Plea Agreement) at ¶ 23.  He was with Highs member Diondre Whitfield-Smart, at a known Highs hangout spot, where a firearm was found behind a dumpster.  *Id.*  In August of 2020, while trespassing at the Winner Gas station, Samuels was arrested in possession of marijuana and MDMA pills packaged for sale.  PSR at ¶ 18; Plea Agreement at ¶ 24.

By January of 2023, at only 24 years old, Samuels was a fully enmeshed five-year-member of the Highs criminal enterprise, contributing to its transition from marijuana trafficking to fentanyl distribution.  Specifically, on January 17, 2023, Samuels and other Highs members were in Highs territory (Boost Mobile parking lot) conducting hand-to-hand drug transitions when police converged on the area.  PSR at ¶ 20; Plea Agreement at ¶ 25-26.  Samuels and others ran into the store and locked themselves inside.  *Id.*  Pursuant to a search warrant, police entered the store and recovered a digital scale and 175 field-tested positive fentanyl pills on another Highs member's person.  PSR at ¶ 21; Plea Agreement at ¶ 26.  Police also recovered 257 fentanyl pills from inside another Highs member's car.  PSR at ¶ 21.

On April 26, 2023, a grand jury in this District charged Samuels and numerous other Highs members with RICO conspiracy, drug trafficking, unlawful firearm possession, and other related offenses.  ECF No. 12.  On December 18, 2023, Samuels pled guilty to engaging in a RICO conspiracy with the Highs criminal enterprise.  ECF Nos. 646.  In doing so, Samuels admitted his involvement with the Highs criminal

enterprise, his role as a drug trafficker for the benefit of the gang, and his joint responsibility for distributing over 400 grams of fentanyl. Plea Agreement at ¶¶ 20-28.

### **The Presentence Investigation Report**

The Presentence Investigation Report calculated a Guidelines range of 130-162 months' imprisonment based on a total offense level of 27 and a criminal history category of VI. PSR at ¶ 134. The parties each have outstanding objections to the PSR.

*Mitigating Role Adjustment (U.S.S.G. § 3B1.2)*

The parties each objected to the PSR's application of a 2-level minor role reduction for Samuels' drug trafficking on behalf of the enterprise, arguing instead that he should receive a 3-level minimal role reduction. *Id.* at A.1-A.4. The PSR concluded that Samuels did not qualify for the 3-level reduction, citing his five-years of active drug trafficking for the enterprise and knowledge that fellow members possessed firearms in conjunction with drug trafficking. *Id.* The government maintains its objection and recommends the Court apply a 3-level minimal role reduction under U.S.S.G. § 3B1.2(b) for Samuels' status as a low-level drug dealer with no personal incidents of violence or leadership status within the enterprise.

Section 3B1.2 of the Sentencing Guidelines permits anywhere from a two-level downward reduction for a defendant who played a mitigating role in the criminal conduct to a four-level reduction for a minimal participant. U.S.S.G. § 3B1.2. Factual circumstances that are between a minimal and minor role are eligible for a three-level reduction. *Id.* The amount of a given reduction is a "fact-based determination" that considers a variety of factors, including the defendant's knowledge, level of participation, control over decision-making, and overall benefits. *Id.*, app. n. 3(C).

8

The government carefully assessed Samuels' relative culpability and the seriousness of his conduct vis-à-vis the entirety of the Highs criminal enterprise. The government and Samuels jointly agree that a 3-level reduction most accurately reflects the mitigating aspects of his role. *See* U.S.S.G. § 3B1.2. Samuels dealt narcotics to benefit the Highs enterprise. He engaged in this misconduct for years, which renders him ineligible for classification as a minimal participant. Overall, however, Samuels' level of drug trafficking paled to many others in the enterprise, there is no evidence to indicate he exerted any decision-making control, and he only marginally profited from his activities. For these reasons, on balance, the parties agreed that Samuels should receive a 3-level reduction to effectively balance his overall culpability against the duration of his involvement.

*Dangerous Weapons Enhancement (U.S.S.G. § 2D1.1(b)(1))*

The PSR applied a 2-level enhancement to Samuels' base offense level under U.S.S.G. § 2D1.1(b)(1), concluding that Samuels shared responsibility for a firearm possessed in connection with underlying narcotics activity in July of 2019. PSR at ¶ A.1. Samuels objects to the enhancement arguing that he did not actually or constructively possess the firearm, did not know that Whitfield-Smart possessed a firearm, and was not engaged in drug trafficking activity because he possessed marijuana without selling it. Defense Objection to PSR at ¶¶ 5, 10, 14. The PSR properly applied the enhancement.

Samuels' objection misses the mark, as it fails to consider that he entered a plea to RICO conspiracy. The Sentencing Guidelines apply a 2-level enhancement to a defendant's base offense level when "a dangerous weapon was possessed" in connection

9

with underlying narcotics conduct. U.S.S.G. § 2D1.1(b)(1). The enhancement "reflects the increased danger of violence when drug traffickers possess weapons." *Id.* at n. 11(A). To show the enhancement applies, "the government need only prove a temporal and spatial nexus among the weapon, defendant, and drug-trafficking activity." *United States v. Delgado-Paz*, 506 F.3d 652, 654 (8th Cir. 2007) (quoted case omitted). In a conspiracy context, the proper focus is the firearm's spatial and temporal nexus to the place where the drugs are stored or where the conspiracy took place. *United States v. Tauil-Hernandez*, 88 F.3d 576, 580 (8th Cir.1996). Additionally, under the principal of "relevant conduct" in conspiracy cases, a defendant is responsible for "acts of others that were taken in furtherance of jointly undertaken criminal activity, if they were reasonably foreseeable by the defendant in connection with that criminal activity." *Delgado-Paz*, 506 F.3d at 654 (citing USSG § 1B1.3(a)(1)(B) & comment (n.2)).

As it relates to his July 2019 arrest, Samuels admits that he possessed marijuana, that a firearm was found hidden behind a dumpster, that he was with another Highs member (Whitfield-Smart) at Highs hangout Winner Gas, that Highs members often distribute drugs there, and that at least one Highs member will be armed for protection while selling drugs at Highs hangouts. Plea Agreement at ¶ 23. This behavior is consistent with the open-air drug market established in Highs territory from which its members and associates routinely sold drugs and possessed firearms. *See* Plea Agreement at ¶¶ 19, 23, 27 (agreeing that Highs territory includes several "specific business from which they control the area drug trade and deal drugs . . ." and that "Highs members often sell drugs with other members"). The presence of a firearm in

10

the same location where Whitfield-Smart ran, while Samuels possessed marijuana, both in Highs territory, provides the nexus needed for the enchantment to apply.

Moreover, Whitfield-Smart's simultaneous marijuana and firearm possession, all within Highs territory, was reasonably foreseeable to Samuels. Samuels was a five-year Highs member who had peddled the enterprise's drugs for years knowing that firearms were used for protection. Plea Agreement at ¶ 23. Even more specifically, Samuels had sufficient association with fellow Highs member Whitfield-Smart to make his firearm possession reasonably foreseeable as part of the conspiracy:



*Figure 4: Samuels (R) and fellow Highs member Diondre Whitfield-Smart (L) on May 22, 2019, Bates 00033424.*

The July 2019 firearm was properly considered relevant conduct that was within the scope of, in furtherance of, and reasonably foreseeable to Samuels in connection with

11

the Highs' jointly undertaken criminal activity. PSR at ¶ A.4; U.S.S.G. § 1B1.3(a)(1)(B). Accordingly, the Court should overrule Samuels' objection and sustain the 2-level firearm enhancement.

The government recommends that the Court find the applicable Guidelines range is 120-150 months' imprisonment, with a total offense level of 26 (base offense level 30; +2 firearm enhancement; -3 minimal role reduction; and -3 acceptance of responsibility) and a Criminal History Category VI.

## The Appropriate Sentence

Samuels must be held to account for his drug dealing on behalf of the Highs criminal enterprise. The danger Samuels posed to public safety and the devastating impact of his actions in furthering the enterprise are undeniable. The government submits that a Guidelines sentence reflects the seriousness of the offense, promotes respect for the law, effects deterrence, and accounts for any mitigating aspects of his personal history.

The Highs created open-air drug markets with the constant ring of gunfire in the middle of residential neighborhoods. Samuels' willing participation in this conduct spread drug addiction through these communities and succeeded in degrading public safety. The criminal activities associated with the Highs' operations, which Samuels supported, undermined the health and safety of the community, and impeded any effort to foster a thriving and secure urban environment.

Beyond the inherent dangerousness of dealing fentanyl in bulk to drug-addicted communities, Samuels knew full well the violence that accompanied his and the Highs' drug trafficking. His association with Whitfield-Smart—who was armed in July 2019—

was no accident and epitomized how Highs members did business. These cases clearly establish that Highs members arm themselves and each other with firearms while peddling their products in Highs territory. It is this "protection" that so often devolved into uncontrolled gunfire and devastated multiple areas of Minneapolis and surrounding cities. These are the actions Samuels facilitated by opting for gang life and choosing the purported prestige that came from associating with the Highs criminal enterprise.

Samuels' personal history contains some mitigating circumstances that warrant consideration. Samuels is young, having just recently turned 24 years old. PSR at F.3. His childhood was marked by financial instability, physical and emotional abuse, early experimentation with drugs and alcohol, and a friend group with known gang associations. *Id*. at ¶¶ 101-104. Notably, Samuels experienced homelessness at only 17 years old. *Id*. at ¶ 103. Samuels chose to lean on the Highs criminal enterprise and ultimately agreed to sell its drugs and share its guns, creating situations where gun violence was often expected.

While Samuels' childhood circumstances provide some context for his decision to join the Highs criminal enterprise, they do not excuse his decision to participate in its criminal activity. As a result, Samuels accepted the destruction the gang wrought on the surrounding community such that his role in perpetuating that reality cannot be minimized. This is especially true for someone like Samuels who has personally experienced multiple losses as a result of gang violence and whose criminal history took a rapid turn for the worse around the time he joined the enterprise. *Id*. at ¶¶ 52-95, 102. Samuels' complicity in the offense conduct and willingness to promote gun

possession—given his unique awareness—is therefore problematic and demonstrates a lack of concern for the safety of others.

It is imperative that Samuels understand the significance of his choices. A custodial sentence within the Guidelines will serve the goals of specific and general deterrence. It is undeniable that the Highs recruit and entice young members—like Samuels—to its ranks, which only strengthens the need for a sentence that sends a strong deterrent message. The duration, breadth, and destruction of the Highs criminal enterprise is unparalleled in the Twin Cities. The Court's sentence, and all those that follow, must send the important message that *each* member of the Highs bears collective responsibility for how the enterprise impacted the community at large.

## Conclusion

For all these reasons, the government respectfully submits that a Guidelines sentence followed by a 3-year term of supervised release fully comports with the United States Sentencing Guidelines and the factors of Title 18, United States Code, Section 3553(a).

Dated: October 03, 2024               Respectfully Submitted,

                                      ANDREW M. LUGER
                                      United States Attorney

                                      */s/ Albania Concepcion*

                                      Albania Concepcion
                                      Attorney ID No. 0401536
                                      Samantha H. Bates
                                      Jordan L. Sing
                                      Justin A. Wesley
                                      Assistant United States Attorneys